GOLDMAN & KRAMER, P.C.
Hannah G. Goldman (HG9596)
101 Eisenhower Parkway
P.O. Box 610
Roseland, New Jersey 07068
Tel: (973) 228-5888
Fax: (973) 228-4606
Attorneys for Plaintiff, Robert Graifman

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROBERT GRAIFMAN,<br><br>        Plaintiff,<br>    v.<br><br>SERVICECHANNEL.COM, INC.,<br>a Corporation of the State of Delaware,<br><br>        Defendant. | : Civil Action No. |

## CIVIL COMPLAINT

Robert Graifman, by way of complaint against the Defendant hereby sets forth as follows:

### Jurisdiction

1.　Jurisdiction is founded upon diversity of citizenship and the amount in controversy. Plaintiff is a citizen of the State of New Jersey. Defendant is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in a state other than New Jersey. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

### COUNT ONE

2.　On or about May 19, 2005, Defendant ServiceChannel.com, Inc. executed (2) promissory notes in the amount of $25,000.00 each. Copies of the promissory notes executed by the Defendant as well as the calculation of principal and interest due thereunder through June 8, 2006 are annexed hereto as **Exhibit "A"**.

3.　Pursuant to the terms of the Promissory Notes, the principal sum accrued

interest at a rate of twelve percent (12%) per annum, commencing October 12, 2000, with all interest and principal due on May 19, 2006 (the "Maturity Date").

4.     Payments of the Promissory Notes were required on their respective maturity dates of May 19, 2006.  Defendant has failed to make any payments on the Promissory Notes, notwithstanding demand for payment.

5.     As of June 8, 2006, there is due on account of said Promissory Notes the sum of $98,607.20, exclusive of interest and costs.

**WHEREFORE**, plaintiff hereby demands judgment against Defendant in the amount of $98,607.20, together with interest, costs and such other relief that the Court may deem just and proper.


/s/ Hannah G. Goldman
Hannah G. Goldman (9596)

Attorneys for Plaintiff, Robert Graifman

GOLDMAN & KRAMER, P.C.
101 Eisenhower Boulevard
P.O. Box 610
Roseland, New Jersey 07068
Tel:  (973) 228-5888
Fax: (973) 228-4606


Dated:    June 27, 2006

# EXHIBIT A

THIS PROMISSORY NOTE IS ONE OF A SERIES OF PROMISSORY NOTES
THAT CONSTITUTE A REPLACEMENT NOTE FOR THE PROMISSORY
NOTE, DATED OCTOBER 12, 2000, ISSUED TO SERVICE INVESTORS, L.P.
IN THE PRINCIPAL AMOUNT OF $300,000.

THE SECURITIES REPRESENTED BY THIS CONVERTIBLE PROMISSORY
NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF
1933 OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE
TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF IN THE ABSENCE
OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE
SECURITY, FILED AND MADE EFFECTIVE UNDER THE SECURITIES ACT
OF 1933 AND SUCH APPLICABLE STATE SECURITIES LAWS, OR UNLESS
THE ISSUER RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO
THE ISSUER TO THE EFFECT THAT REGISTRATION UNDER SUCH ACT
AND SUCH APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

$25,000

## SERVICECHANNEL.COM, INC.

May 19, 2005

ServiceChannel.com, Inc., a Delaware corporation ("Issuer"), for value
received, hereby promises to pay to Robert Graifman ("Noteholder") and his successors,
transferees and assigns, by wire transfer of immediately available funds to an account
designated by Noteholder by notice to Issuer the principal sum of TWENTY FIVE
THOUSAND ($25,000) ("Note Amount") and all interest accrued thereon on the
Maturity Date (as defined herein) in such coin or currency of the United States of
America as at the time of payment shall be legal tender for the payment of public and
private debts or as provided in Section 5 hereof.

The Note Amount shall bear interest accruing from October 12, 2000 to
the date this Note shall have been converted or repaid in full at the rate of twelve percent
(12%) per annum. All computations of interest payable hereunder shall be on the basis of
a 360-day year and actual days elapsed in the period for which such interest is payable.
Interest shall be payable on the Maturity Date.

This note (the "Note") is one of the duly authorized notes of Issuer (the
"Notes") referred to in the Securities Purchase Agreement ("Securities Purchase
Agreement") dated as of October 12, 2000 among the Issuer and the Investors listed on
Schedule A thereto. This Note is transferable or assignable by Noteholder or any
transferee of Noteholder only to an Affiliate or a partner, or an heir, administrator,
executor or successor of Noteholder; provided that such transfer or assignment is made in
compliance with the Securities Act of 1933, as amended, and any applicable state and
foreign securities laws. Issuer agrees to issue to Noteholder or any transferee of

Noteholder from time to time a replacement note or notes in the form hereof and in such denominations as such Person may request to facilitate such transfers and assignments. In addition, after delivery of an indemnification agreement in form and substance satisfactory to Issuer, Issuer also agrees to issue a replacement note if this Note has been lost, stolen, mutilated or destroyed.

Section 1. Definitions. The following terms (except as otherwise expressly provided) for all purposes of this Note shall have the respective meanings specified below. All accounting terms used herein and not expressly defined shall have the meanings given to them in accordance with generally accepted accounting principles as in effect from time to time. The terms defined in this Section 1 include the plural as well as the singular.

"Acceleration Notice" shall have the meaning set forth in Section 3.1.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For the purposes of this definition, "control" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Bankruptcy Law" means title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized by law to close.

"Conversion Price" shall have the meaning set forth in the Certificate of Designation, Preferences and other Rights and Qualifications of the Series A Preferred Stock.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"Debt" means at any date, without duplication, an amount equal to or greater than $200,000 of (i) all obligations of the Issuer for borrowed money, (ii) all obligations of the Issuer evidenced by bonds, debentures, notes, or other similar instruments, (iii) all obligations of the Issuer in respect of letters of credit or other similar instruments (or reimbursement obligations with respect thereto), except letters of credit or other similar instruments issued to secure payment of Trade Payables, (iv) all obligations of the Issuer to pay the deferred purchase price of property or services, except Trade Payables, (v) all obligations of the Issuer as lessee under capitalized leases, (vi) all Debt of others secured by a Lien on any asset of the Issuer, whether or not such Debt is assumed by such Person and (vii) all Debt of others Guaranteed by the Issuer.

2

"Default" means any condition or event which constitutes an Event of Default or which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Demand Notice" means a written notice to the Issuer from the Holder upon an Event of Default in accordance with Section 3.1 hereof.

"Equity Offering" shall collectively mean each private offering completed after the date hereof (exclusively of any subsequent closing under the Securities Purchase Agreement) by the Issuer of any of its equity securities (or securities convertible into equity securities) (the next offering of which is intended to be Series B Convertible Preferred Stock).

"Event of Default" shall have the meaning set forth in Section 3.1.

"Qualified Equity Offering" shall mean one or more Equity Offerings that result in aggregate gross cash proceeds to the Issuer of at least eight million dollars ($8,000,000), exclusive of cash proceeds received pursuant to the Securities Purchase Agreement.

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such other Person (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation for the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset. For the purposes of this Note, Issuer shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capitalized lease or other title retention agreement relating to such asset.

"Material Adverse Effect" means a material adverse effect on the condition (financial or otherwise), assets, liabilities, business, results of operations or prospects of Issuer.

3

"Maturity Date" means the earliest to occur of (i) the initial closing of a Qualified Equity Offering, (ii) the receipt by the Issuer of a Demand Notice in accordance with Section 3.1 hereof or (iii) May 19, 2006.

"Securities Purchase Agreement" means that certain Securities Purchase Agreement of the Issuer dated October 12, 2000.

"Notice of Default" shall have the meaning set forth in Section 3.1(c).

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization.

"Restricted Payment" means (i) any dividend, distribution or other payment on any capital stock of the Issuer or (ii) any payment on account of the purchase, redemption, retirement or acquisition of (a) any capital stock or (b) any option, warrant or other right to acquire capital stock of Issuer, except that the Issuer shall be entitled to repurchase, pursuant to applicable stock restrictions or similar agreements, shares of Common Stock held by employees or consultants.

"Series A Preferred Stock" means the Series A Convertible Preferred Stock, par value $.01 per share, of the Issuer.

"Trade Payables" means accounts payable or any other indebtedness or monetary obligations to trade creditors created or assumed by Issuer in the ordinary course of business in connection with the obtaining of materials or services.

Section 2. Payment of Principal and Interest.

Section 2.1. Payment Obligation. No provision of this Note shall alter or impair the obligations of Issuer, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, times and rate, and in the currency, herein prescribed, subject to the conversion provisions of this Note as provided herein.

All payments made on account of this Note, including prepayments, shall be applied first to the payment of any costs of enforcement then due hereunder, second to the payment of accrued and unpaid interest then due hereunder, and the remainder, if any, shall be applied to the unpaid balance of the Note Amount.

Section 3. Events of Default and Remedies.

Section 3.1. Event of Default Defined; Acceleration of Maturity; Waiver of Default. If one or more of the following events ("Events of Default") (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) shall have occurred and be continuing:

4

(a)    default in the payment of all or any part of the principal of any of the Notes as and when the same shall become due and payable, at maturity, upon any redemption, by declaration or otherwise; or

(b)    a default in the payment of all or any part of the interest on any of the Notes as and when same shall become due and payable and the default continues for a period of ten days; or

(c)    failure on the part of Issuer duly to observe or perform any other of the covenants or agreements on the part of Issuer contained herein (other than those covered by clauses (a) and (b) above) for a period of 30 days after the date on which written notice specifying such failure, stating that such notice is a "Notice of Default" hereunder and demanding that Issuer remedy the same, shall have been given by registered or certified mail, return receipt requested, to Issuer; or

(d)    Issuer shall fail to make any payment in respect of any Debt when due or within any applicable grace period or any event or condition shall occur which results in the acceleration of the maturity of any Debt or enables (or, with the giving of notice or lapse of time or both, would enable) the holder of such Debt or any Person acting on such holder's behalf to accelerate the maturity thereof; or

(e)    a judgment or order (not covered by insurance) for the payment of money shall be rendered against Issuer in excess of $250,000 individually or $500,000 in the aggregate for all such judgments or orders (treating any deductibles, self insurance or retention as not so covered) shall be rendered against Issuer and such judgment or order shall continue unsatisfied and unstayed for a period of 30 days; or

(f)    Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i)    commences a voluntary case or proceeding;

(ii)    consents to the entry of an order for relief against it in an involuntary case or proceeding;

(iii)    consents to the appointment of a Custodian of it or for all or substantially all of its property;

(iv)    makes a general assignment for the benefit of its creditors; or

(v)    admits in writing its inability to pay its debts as the same become due; or

(g)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

291560-1

(i)       is for relief against Issuer in an involuntary case;

(ii)      appoints a Custodian of Issuer or for all or substantially all of the property of Issuer; or

(iii)     orders the liquidation of Issuer.

and such order or decree remains unstayed and in effect for 60 days;

then the Holder, by notice in writing to Issuer (the "Acceleration Notice"), may declare the Note Amount to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable; provided that if an Event of Default specified in Section 3.1(f) or 3.1(g) occurs, the Note Amount shall become and be immediately due and payable without any declaration or other act on the part of the Holder.

Section 3.2.   Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default. No right or remedy herein conferred upon or reserved to the Holder is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

No delay or omission of the Holder to exercise any right or power accruing upon any Default or Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Default or Event of Default or an acquiescence therein; and every power and remedy given by this Note or by law may be exercised from time to time, and as often as shall be deemed expedient, by the Holder.

Section 3.3.   Waiver of Past Defaults. The Holder may waive any past Default or Event of Default hereunder and its consequences. In the case of any such waiver, Issuer and the Holder shall be restored to its former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Upon any such waiver, such Default shall cease to exist and be deemed to have been cured and not to have occurred, and any Default or Event of Default arising therefrom shall be deemed to have been cured, and not to have occurred for every purpose of this Note, and the interest rate hereon shall not be deemed to have increased; but no such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon.

Section 4.  Covenants. Issuer agrees that, so long as any amount payable under this Note remains unpaid:

Section 4.1.  Limitation on Debt.

(a)  The Note shall be senior to all existing and future indebtedness of the Issuer.

(b)  Issuer will not create, incur, Guarantee, issue, assume or in any manner become liable in respect of, any Debt other than Debt existing on the date of this Note or other obligations or other liabilities incurred in connection with Liens permitted to be incurred under Section 4.2(f) or 4.2(g) hereof or any Debt not existing on the date of this Agreement if such Debt is less than $200,000 in the aggregate or is incurred in the ordinary course of business.

Section 4.2.  Limitation on Liens. Issuer shall not create, incur, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except:

(a)  Liens existing on the date hereof;

(b)  Liens for taxes or assessments and similar charges either (x) not delinquent or (y) contested in good faith by appropriate proceedings and as to which Issuer shall have set aside on its books adequate reserves;

(c)  Liens incurred or pledges and deposits in connection with workers' compensation, unemployment insurance and other social security benefits, or securing the performance bids, tenders, leases, contracts (other than for the repayment of borrowed money), statutory obligations, progress payments, surety and appeal bonds and other obligations of like nature, incurred in the ordinary course of business;

(d)  Liens imposed by law, such as mechanics', carriers', warehousemen's, materialmen's and vendors' Liens, incurred in good faith in the ordinary course of business;

(e)  zoning restrictions, easements, licenses, covenants, reservations, restrictions on the use of real property or minor irregularities of title incident thereto which do not in the aggregate materially detract from the value of the property or assets of Issuer taken as a whole or impair the use of such property in the operation of Issuer's business; and

(f)  Liens incurred or assumed which are purchase money Liens upon or in any property acquired in the ordinary course of business; and.

(g)  other Liens incidental to the conduct of the Issuer's business or the ownership of its property and assets which were not incurred in connection with the

7

borrowing of money, and which do not in the aggregate materially detract from the value of its property or assets.

Section 4.3.   Restricted Payments. Distributions and Redemptions. Issuer shall not declare or make any Restricted Payments.

Section 5.   Conversion.

Section 5.1.   Optional Conversion. At the option of the Holder, the Note Amount and all interest accrued (but unpaid) thereon shall convert into fully paid and non-assessable shares of the securities issued in an Equity Offering into which the Holder so elects to convert the Note. Except as otherwise provided herein, the Holder of this Note shall receive upon conversion of this Note pursuant to the terms of this Section 5.1 such whole number of shares that is equal to the quotient of the Note Amount plus all interest accrued but unpaid thereon divided by the per share offering price of the securities being issued in the Equity Offering into which the Note shall convert and upon conversion the Holder shall have all the same rights, privileges and preferences as the purchasers of the securities issued in such Equity Offering. The Issuer shall give the Holder written notice of any Equity Offering at least ten (10) days prior to the closing of any Equity Offering.

Section 5.2   Manadatory Conversion. Upon the closing of a Qualified Equity Offering, the Note Amount and all interest accrued (but unpaid) thereon shall automatically convert into fully paid and non-assessable shares of the securities being issued in such Qualified Equity Offering. Except as otherwise provided herein, the Holder of this Note shall receive upon conversion of this Note pursuant to the terms of this Section 5.2 such whole number of shares that is equal to the quotient of the Note Amount plus all interest accrued but unpaid thereon divided by the per share offering price (the "Offering Price") of the securities being issued in such Qualified Equity Offering and upon conversion the Holder shall have all the same rights, privileges and preferences as the purchasers of the securities issued in such Qualified Equity Offering. The Issuer shall give the Holder written notice of any Qualified Equity Offering at least ten (10) days prior to the closing of any Qualified Equity Offering. In the event a Qualified Equity Offering consists of more than one Equity Offering for purposes herein, the Offering Price shall be the lowest Offering Price of such Equity Offerings.

Section 5.3.   Event of Sale. Upon the occurrence of an Event of Sale (as hereinafter defined) at the option of the Noteholder, (i) the Noteholder shall receive the entire Note Amount plus all accrued and unpaid interest thereon or (ii) the Noteholder shall have the right to convert the entire Note Amount together with accrued and unpaid interest thereon into such number of shares of Common Stock, to be issued to the Noteholder immediately prior to the Closing of the Event of Sale, at a conversion price per share equal to the lesser of (A) a fifty (50%) discount to the fully diluted equity valuation of the Company (total purchase price divided by the fully diluted outstanding shares after giving effect to the exercise and conversion of all outstanding options, warrants and convertible securities including the Notes plus all consideration received by

8

291560-1

the Issuer upon exercise such outstanding options, warrants and convertible securities) in such Event of Sale or (B) two times the Conversion Price of the Series A Preferred Stock then in effect; provided, that, at the option of the Noteholder, the entire value of such Common Stock payable pursuant to (A) or (B) above shall be paid out in cash to the Noteholder to the extent the cash component of such Event of Sale is sufficient to pay all Noteholders who elect to receive payment pursuant to this provision in cash or if the consideration consists solely of cash. An "Event of Sale" shall mean the merger or consolidation of the Issuer into or with a corporation not previously affiliated with the Issuer, the sale of capital stock or the sale of all or substantially all the assets of the Issuer to a person not previously affiliated with the Issuer, in a single transaction or series of related transactions, unless, upon consummation of such merger, consolidation, sale of capital stock or sale of assets, the holders of voting securities of the Issuer immediately prior to such merger, consolidation, sale of capital stock or sale of assets own directly or indirectly more than 50% of the voting power to elect directors of the consolidated or surviving or acquiring corporation.

Section 5.4.    Fractional Shares.    Upon the conversion of this Note pursuant to this Section 5, no fractional shares or scrip representing fractional shares shall be issued. With respect to any fraction of a share called for upon the conversion of this Note or any portion hereof, a cash amount equal to the product of such fraction multiplied by the per share offering price of the securities sold in the Equity Offering or the Qualified Equity Offering, as the case may be, shall be paid to the Noteholder.

Section 6.    Cost of Collection; Waiver of Presentment.    The Issuer shall also be responsible for all costs incurred by Holder to enforce or collect this Note, including, without limitation, reasonable attorney's fees and expenses and court costs. The Issuer hereby waives presentment, protest and demand, notice of protest, notice of demand and dishonor and expressly agrees that this Note, or any payment due hereunder, may be extended from time to time, without in any way affecting the liability of the Issuer or any guarantor or endorser.

Section 7.    Modification of Notes. This Note may be modified with the written consent of the Holder. The Holder may waive in writing compliance by Issuer of any provision of this Note. After an amendment becomes effective, Issuer shall mail to the Noteholder a notice briefly describing the amendment.

Section 8.    Miscellaneous. This Note shall be governed by and be construed in accordance with the laws of the State of New York without regard to the conflicts of law rules of such state. Issuer hereby irrevocably submits to the non-exclusive jurisdiction of any New York state court or Federal court sitting in the State of New York over any action or proceeding arising out of or relating to this Note and Issuer hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or Federal court. Issuer hereby irrevocably waives, to the fullest extent legally possible, the defense of an inconvenient forum to the maintenance of such action or proceeding. Issuer hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery,

9

291560-1

acceptance, performance and enforcement of this Note, except as specifically provided herein, and assent to extensions of the time of payment, or forbearance or other indulgence without notice. Outstanding Notes held by Affiliates of Issuer shall be deemed to be outstanding for purposes of any action required or permitted to be taken hereunder by Holders of outstanding Notes. The Holder by acceptance of this Note agrees to be bound by the provisions of this Note. The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, Issuer has caused this instrument to be duly executed as of this 19th day of May, 2005.

SERVICECHANNEL.COM, INC.

By: _____

· Name: Steven Gottfried
Title: President

10

THIS PROMISSORY NOTE IS ONE OF A SERIES OF PROMISSORY NOTES THAT CONSTITUTE A REPLACEMENT NOTE FOR THE PROMISSORY NOTE, DATED OCTOBER 12, 2000, ISSUED TO SERVICE INVESTORS, L.P. IN THE PRINCIPAL AMOUNT OF $300,000.

THE SECURITIES REPRESENTED BY THIS CONVERTIBLE PROMISSORY NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE SECURITY, FILED AND MADE EFFECTIVE UNDER THE SECURITIES ACT OF 1933 AND SUCH APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER TO THE EFFECT THAT REGISTRATION UNDER SUCH ACT AND SUCH APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

$25,000

## SERVICECHANNEL.COM, INC.

### May 19, 2005

ServiceChannel.com, Inc., a Delaware corporation ("Issuer"), for value received, hereby promises to pay to Robert Graifman ("Noteholder") and his successors, transferees and assigns, by wire transfer of immediately available funds to an account designated by Noteholder by notice to Issuer the principal sum of TWENTY FIVE THOUSAND ($25,000) ("Note Amount") and all interest accrued thereon on the Maturity Date (as defined herein) in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts or as provided in Section 5 hereof.

The Note Amount shall bear interest accruing from October 12, 2000 to the date this Note shall have been converted or repaid in full at the rate of twelve percent (12%) per annum. All computations of interest payable hereunder shall be on the basis of a 360-day year and actual days elapsed in the period for which such interest is payable. Interest shall be payable on the Maturity Date.

This note (the "Note") is one of the duly authorized notes of Issuer (the "Notes") referred to in the Securities Purchase Agreement ("Securities Purchase Agreement") dated as of October 12, 2000 among the Issuer and the Investors listed on Schedule A thereto. This Note is transferable or assignable by Noteholder or any transferee of Noteholder only to an Affiliate or a partner, or an heir, administrator, executor or successor of Noteholder; provided that such transfer or assignment is made in compliance with the Securities Act of 1933, as amended, and any applicable state and foreign securities laws. Issuer agrees to issue to Noteholder or any transferee of

Noteholder from time to time a replacement note or notes in the form hereof and in such denominations as such Person may request to facilitate such transfers and assignments. In addition, after delivery of an indemnification agreement in form and substance satisfactory to Issuer, Issuer also agrees to issue a replacement note if this Note has been lost, stolen, mutilated or destroyed.

        Section 1.    Definitions.   The following terms (except as otherwise expressly provided) for all purposes of this Note shall have the respective meanings specified below. All accounting terms used herein and not expressly defined shall have the meanings given to them in accordance with generally accepted accounting principles as in effect from time to time. The terms defined in this Section 1 include the plural as well as the singular.

        "Acceleration Notice" shall have the meaning set forth in Section 3.1.

        "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For the purposes of this definition, "control" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

        "Bankruptcy Law" means title 11, U.S. Code or any similar federal or state law for the relief of debtors.

        "Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized by law to close.

        "Conversion Price" shall have the meaning set forth in the Certificate of Designation, Preferences and other Rights and Qualifications of the Series A Preferred Stock.

        "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

        "Debt" means at any date, without duplication, an amount equal to or greater than $200,000 of (i) all obligations of the Issuer for borrowed money, (ii) all obligations of the Issuer evidenced by bonds, debentures, notes, or other similar instruments, (iii) all obligations of the Issuer in respect of letters of credit or other similar instruments (or reimbursement obligations with respect thereto), except letters of credit or other similar instruments issued to secure payment of Trade Payables, (iv) all obligations of the Issuer to pay the deferred purchase price of property or services, except Trade Payables, (v) all obligations of the Issuer as lessee under capitalized leases, (vi) all Debt of others secured by a Lien on any asset of the Issuer, whether or not such Debt is assumed by such Person and (vii) all Debt of others Guaranteed by the Issuer.

291560-1

"Default" means any condition or event which constitutes an Event of Default or which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Demand Notice" means a written notice to the Issuer from the Holder upon an Event of Default in accordance with Section 3.1 hereof.

"Equity Offering" shall collectively mean each private offering completed after the date hereof (exclusively of any subsequent closing under the Securities Purchase Agreement) by the Issuer of any of its equity securities (or securities convertible into equity securities) (the next offering of which is intended to be Series B Convertible Preferred Stock).

"Event of Default" shall have the meaning set forth in Section 3.1.

"Qualified Equity Offering" shall mean one or more Equity Offerings that result in aggregate gross cash proceeds to the Issuer of at least eight million dollars ($8,000,000), exclusive of cash proceeds received pursuant to the Securities Purchase Agreement.

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such other Person (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation for the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset. For the purposes of this Note, Issuer shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capitalized lease or other title retention agreement relating to such asset.

"Material Adverse Effect" means a material adverse effect on the condition (financial or otherwise), assets, liabilities, business, results of operations or prospects of Issuer.

3

"Maturity Date" means the earliest to occur of (i) the initial closing of a Qualified Equity Offering, (ii) the receipt by the Issuer of a Demand Notice in accordance with Section 3.1 hereof or (iii) May 19, 2006.

"Securities Purchase Agreement" means that certain Securities Purchase Agreement of the Issuer dated October 12, 2000.

"Notice of Default" shall have the meaning set forth in Section 3.1(c).

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization.

"Restricted Payment" means (i) any dividend, distribution or other payment on any capital stock of the Issuer or (ii) any payment on account of the purchase, redemption, retirement or acquisition of (a) any capital stock or (b) any option, warrant or other right to acquire capital stock of Issuer, except that the Issuer shall be entitled to repurchase, pursuant to applicable stock restrictions or similar agreements, shares of Common Stock held by employees or consultants.

"Series A Preferred Stock" means the Series A Convertible Preferred Stock, par value $.01 per share, of the Issuer.

"Trade Payables" means accounts payable or any other indebtedness or monetary obligations to trade creditors created or assumed by Issuer in the ordinary course of business in connection with the obtaining of materials or services.

Section 2.     Payment of Principal and Interest.

Section 2.1.     Payment Obligation. No provision of this Note shall alter or impair the obligations of Issuer, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, times and rate, and in the currency, herein prescribed, subject to the conversion provisions of this Note as provided herein.

All payments made on account of this Note, including prepayments, shall be applied first to the payment of any costs of enforcement then due hereunder, second to the payment of accrued and unpaid interest then due hereunder, and the remainder, if any, shall be applied to the unpaid balance of the Note Amount.

Section 3.     Events of Default and Remedies.

Section 3.1.     Event of Default Defined; Acceleration of Maturity; Waiver of Default. If one or more of the following events ("Events of Default") (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) shall have occurred and be continuing:

4

(a)     default in the payment of all or any part of the principal of any of the Notes as and when the same shall become due and payable, at maturity, upon any redemption, by declaration or otherwise; or

(b)     a default in the payment of all or any part of the interest on any of the Notes as and when same shall become due and payable and the default continues for a period of ten days; or

(c)     failure on the part of Issuer duly to observe or perform any other of the covenants or agreements on the part of Issuer contained herein (other than those covered by clauses (a) and (b) above) for a period of 30 days after the date on which written notice specifying such failure, stating that such notice is a "Notice of Default" hereunder and demanding that Issuer remedy the same, shall have been given by registered or certified mail, return receipt requested, to Issuer; or

(d)     Issuer shall fail to make any payment in respect of any Debt when due or within any applicable grace period or any event or condition shall occur which results in the acceleration of the maturity of any Debt or enables (or, with the giving of notice or lapse of time or both, would enable) the holder of such Debt or any Person acting on such holder's behalf to accelerate the maturity thereof; or

(e)     a judgment or order (not covered by insurance) for the payment of money shall be rendered against Issuer in excess of $250,000 individually or $500,000 in the aggregate for all such judgments or orders (treating any deductibles, self insurance or retention as not so covered) shall be rendered against Issuer and such judgment or order shall continue unsatisfied and unstayed for a period of 30 days; or

(f)     Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i)     commences a voluntary case or proceeding;

(ii)    consents to the entry of an order for relief against it in an involuntary case or proceeding;

(iii)   consents to the appointment of a Custodian of it or for all or substantially all of its property;

(iv)    makes a general assignment for the benefit of its creditors; or

(v)     admits in writing its inability to pay its debts as the same become due; or

(g)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

5

      (i)      is for relief against Issuer in an involuntary case;

      (ii)     appoints a Custodian of Issuer or for all or substantially all of the property of Issuer; or

      (iii)    orders the liquidation of Issuer.

and such order or decree remains unstayed and in effect for 60 days;

then the Holder, by notice in writing to Issuer (the "Acceleration Notice"), may declare the Note Amount to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable; provided that if an Event of Default specified in Section 3.1(f) or 3.1(g) occurs, the Note Amount shall become and be immediately due and payable without any declaration or other act on the part of the Holder.

      Section 3.2.    Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default. No right or remedy herein conferred upon or reserved to the Holder is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

      No delay or omission of the Holder to exercise any right or power accruing upon any Default or Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Default or Event of Default or an acquiescence therein; and every power and remedy given by this Note or by law may be exercised from time to time, and as often as shall be deemed expedient, by the Holder.

      Section 3.3.    Waiver of Past Defaults. The Holder may waive any past Default or Event of Default hereunder and its consequences. In the case of any such waiver, Issuer and the Holder shall be restored to its former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

      Upon any such waiver, such Default shall cease to exist and be deemed to have been cured and not to have occurred, and any Default or Event of Default arising therefrom shall be deemed to have been cured, and not to have occurred for every purpose of this Note, and the interest rate hereon shall not be deemed to have increased; but no such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon.

6

Section 4.    Covenants. Issuer agrees that, so long as any amount payable under this Note remains unpaid:

Section 4.1.    Limitation on Debt.

(a)    The Note shall be senior to all existing and future indebtedness of the Issuer.

(b)    Issuer will not create, incur, Guarantee, issue, assume or in any manner become liable in respect of, any Debt other than Debt existing on the date of this Note or other obligations or other liabilities incurred in connection with Liens permitted to be incurred under Section 4.2(f) or 4.2(g) hereof or any Debt not existing on the date of this Agreement if such Debt is less than $200,000 in the aggregate or is incurred in the ordinary course of business.

Section 4.2.    Limitation on Liens. Issuer shall not create, incur, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except:

(a)    Liens existing on the date hereof;

(b)    Liens for taxes or assessments and similar charges either (x) not delinquent or (y) contested in good faith by appropriate proceedings and as to which Issuer shall have set aside on its books adequate reserves;

(c)    Liens incurred or pledges and deposits in connection with workers' compensation, unemployment insurance and other social security benefits, or securing the performance bids, tenders, leases, contracts (other than for the repayment of borrowed money), statutory obligations, progress payments, surety and appeal bonds and other obligations of like nature, incurred in the ordinary course of business;

(d)    Liens imposed by law, such as mechanics', carriers', warehousemen's, materialmen's and vendors' Liens, incurred in good faith in the ordinary course of business;

(e)    zoning restrictions, easements, licenses, covenants, reservations, restrictions on the use of real property or minor irregularities of title incident thereto which do not in the aggregate materially detract from the value of the property or assets of Issuer taken as a whole or impair the use of such property in the operation of Issuer's business; and

(f)    Liens incurred or assumed which are purchase money Liens upon or in any property acquired in the ordinary course of business; and.

(g)    other Liens incidental to the conduct of the Issuer's business or the ownership of its property and assets which were not incurred in connection with the

7

borrowing of money, and which do not in the aggregate materially detract from the value of its property or assets.

Section 4.3.    Restricted Payments, Distributions and Redemptions. Issuer shall not declare or make any Restricted Payments.

Section 5.    Conversion.

Section 5.1.    Optional Conversion. At the option of the Holder, the Note Amount and all interest accrued (but unpaid) thereon shall convert into fully paid and non-assessable shares of the securities issued in an Equity Offering into which the Holder so elects to convert the Note. Except as otherwise provided herein, the Holder of this Note shall receive upon conversion of this Note pursuant to the terms of this Section 5.1 such whole number of shares that is equal to the quotient of the Note Amount plus all interest accrued but unpaid thereon divided by the per share offering price of the securities being issued in the Equity Offering into which the Note shall convert and upon conversion the Holder shall have all the same rights, privileges and preferences as the purchasers of the securities issued in such Equity Offering. The Issuer shall give the Holder written notice of any Equity Offering at least ten (10) days prior to the closing of any Equity Offering.

Section 5.2    Manadatory Conversion. Upon the closing of a Qualified Equity Offering, the Note Amount and all interest accrued (but unpaid) thereon shall automatically convert into fully paid and non-assessable shares of the securities being issued in such Qualified Equity Offering. Except as otherwise provided herein, the Holder of this Note shall receive upon conversion of this Note pursuant to the terms of this Section 5.2 such whole number of shares that is equal to the quotient of the Note Amount plus all interest accrued but unpaid thereon divided by the per share offering price (the "Offering Price") of the securities being issued in such Qualified Equity Offering and upon conversion the Holder shall have all the same rights, privileges and preferences as the purchasers of the securities issued in such Qualified Equity Offering. The Issuer shall give the Holder written notice of any Qualified Equity Offering at least ten (10) days prior to the closing of any Qualified Equity Offering. In the event a Qualified Equity Offering consists of more than one Equity Offering for purposes herein, the Offering Price shall be the lowest Offering Price of such Equity Offerings.

Section 5.3.    Event of Sale. Upon the occurrence of an Event of Sale (as hereinafter defined) at the option of the Noteholder, (i) the Noteholder shall receive the entire Note Amount plus all accrued and unpaid interest thereon or (ii) the Noteholder shall have the right to convert the entire Note Amount together with accrued and unpaid interest thereon into such number of shares of Common Stock, to be issued to the Noteholder immediately prior to the Closing of the Event of Sale, at a conversion price per share equal to the lesser of (A) a fifty (50%) discount to the fully diluted equity valuation of the Company (total purchase price divided by the fully diluted outstanding shares after giving effect to the exercise and conversion of all outstanding options, warrants and convertible securities including the Notes plus all consideration received by

8

291560-1

the Issuer upon exercise such outstanding options, warrants and convertible securities) in such Event of Sale or (B) two times the Conversion Price of the Series A Preferred Stock then in effect; provided, that, at the option of the Noteholder, the entire value of such Common Stock payable pursuant to (A) or (B) above shall be paid out in cash to the Noteholder to the extent the cash component of such Event of Sale is sufficient to pay all Noteholders who elect to receive payment pursuant to this provision in cash or if the consideration consists solely of cash. An "Event of Sale" shall mean the merger or consolidation of the Issuer into or with a corporation not previously affiliated with the Issuer, the sale of capital stock or the sale of all or substantially all the assets of the Issuer to a person not previously affiliated with the Issuer, in a single transaction or series of related transactions, unless, upon consummation of such merger, consolidation, sale of capital stock or sale of assets, the holders of voting securities of the Issuer immediately prior to such merger, consolidation, sale of capital stock or sale of assets own directly or indirectly more than 50% of the voting power to elect directors of the consolidated or surviving or acquiring corporation.

Section 5.4. Fractional Shares. Upon the conversion of this Note pursuant to this Section 5, no fractional shares or scrip representing fractional shares shall be issued. With respect to any fraction of a share called for upon the conversion of this Note or any portion hereof, a cash amount equal to the product of such fraction multiplied by the per share offering price of the securities sold in the Equity Offering or the Qualified Equity Offering, as the case may be, shall be paid to the Noteholder.

Section 6. Cost of Collection; Waiver of Presentment. The Issuer shall also be responsible for all costs incurred by Holder to enforce or collect this Note, including, without limitation, reasonable attorney's fees and expenses and court costs. The Issuer hereby waives presentment, protest and demand, notice of protest, notice of demand and dishonor and expressly agrees that this Note, or any payment due hereunder, may be extended from time to time, without in any way affecting the liability of the Issuer or any guarantor or endorser.

Section 7. Modification of Notes. This Note may be modified with the written consent of the Holder. The Holder may waive in writing compliance by Issuer of any provision of this Note. After an amendment becomes effective, Issuer shall mail to the Noteholder a notice briefly describing the amendment.

Section 8. Miscellaneous. This Note shall be governed by and be construed in accordance with the laws of the State of New York without regard to the conflicts of law rules of such state. Issuer hereby irrevocably submits to the non-exclusive jurisdiction of any New York state court or Federal court sitting in the State of New York over any action or proceeding arising out of or relating to this Note and Issuer hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or Federal court. Issuer hereby irrevocably waives, to the fullest extent legally possible, the defense of an inconvenient forum to the maintenance of such action or proceeding. Issuer hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery,

9

acceptance, performance and enforcement of this Note, except as specifically provided herein, and assent to extensions of the time of payment, or forbearance or other indulgence without notice. Outstanding Notes held by Affiliates of Issuer shall be deemed to be outstanding for purposes of any action required or permitted to be taken hereunder by Holders of outstanding Notes. The Holder by acceptance of this Note agrees to be bound by the provisions of this Note. The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, Issuer has caused this instrument to be duly executed as of this 19th day of May, 2005.

SERVICECHANNEL.COM, INC.

By: _____

· Name: Steven Gottfried
Title: President

10

## Service Channel Interest Calculations

|        | Principal   | Start Date | Through  | Days Out | Rate      | Payoff      |
|--------|-------------|------------|----------|----------|-----------|-------------|
| Note 1 | $25,000.00  | 10/12/2000 | 6/8/2006 | 2,066    | 12%       | $49,303.60  |
| Note 2 | $25,000.00  | 10/12/2000 | 6/8/2006 | 2,066    | 12%       | $49,303.60  |
|        |             |            |          |          | Total Due | $98,607.20  |